Reyes v. New York City Department of Education

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: November 6, 2013                              Decided: July 25, 2014)

Docket No. 13-158

------------------------------------

DOMINGA REYES, on behalf of and as Parent and Guardian of R.P., a student with a disability,

*Plaintiff-Appellant*,

- v -

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee.**

------------------------------------

Before:        SACK, HALL, and LIVINGSTON, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (William H. Pauley III, *Judge*) upholding a New York State Review Officer's final administrative decision overturning an

---

* The Clerk of the Court is respectfully directed to amend the official caption to conform to the caption set forth above.

Impartial Hearing Officer's award of tuition reimbursement under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* Because we conclude that the proposed individualized education program and school placement failed to provide R.P. with the free appropriate public education guaranteed to him by the Act, we REVERSE and REMAND to the district court for further proceedings.

ERIN McCORMACK-HERBERT (Michael D. Hampden, *of counsel*), Partnership for Children's Rights, New York, NY, *for Appellant*.

KATHY H. CHANG (Michael A. Cardozo, Corporation Counsel, and Larry A. Sonnenshein, *of counsel*), Corporation Counsel of the City of New York, New York, NY, *for Appellee*.

SACK, *Circuit Judge*:

The Individuals with Disabilities Education Act ("IDEA") promises each child with a disability a free appropriate public education ("FAPE"),[1] 20 U.S.C. § 1400(d)(1)(A), which must be "reasonably calculated to enable the child to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). To

---

[1] **Glossary of Acronyms**: As in *M.H. v. New York City Department of Education*, 685 F.3d 217 (2d Cir. 2012), "[t]his opinion, dealing as it does with the IDEA and practices thereunder, is replete with acronyms. In addition to their definition in the text, a separate glossary of acronyms is therefore set forth in the Appendix to this opinion." *Id.* at 223 n.1.

fulfill this promise, the IDEA allows parents who think that their local school district is not providing their child a FAPE to enroll the child in a private school program unilaterally and thereafter seek reimbursement for the private school tuition from the school district. 20 U.S.C. § 1412(a)(10)(C)(ii). Deciding that the individualized education program ("IEP") proposed by the New York City Department of Education ("DOE") for the 2010-2011 school year failed to provide her son a FAPE, Reyes enrolled him at the private Rebecca School in Manhattan and brought a due-process complaint seeking tuition reimbursement. An impartial hearing officer ("IHO") granted her relief, but a state review officer ("SRO") reversed that decision on appeal. Reyes then filed a civil action in the United States District Court for the Southern District of New York. The district court (William H. Pauley III, *Judge*) affirmed the SRO's decision.

Reyes appealed, arguing principally that the SRO relied on retrospective testimony impermissible under *R.E. v. New York City Department of Education*, 694 F.3d 167, 186 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2802 (2013). We reverse the judgment and remand the cause to the district court for further proceedings.

## STATUTORY BACKGROUND

The Individuals with Disabilities Education Act requires all states receiving federal funds to provide "all children with disabilities" a "free appropriate public

education," 20 U.S.C. § 1412(a)(1)(A), to "prepare them for further education, employment, and independent living," *id.* § 1400(d)(1)(A). A FAPE consists of "special education and related services tailored to meet the unique needs of a particular child," *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted), which are "reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 207, and provided in conformity with an individualized education program, or IEP, 20 U.S.C. § 1401(9)(D). The IEP, which the school district is required to prepare annually, must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives. 20 U.S.C. § 1414(d). Under New York law, local Committees on Special Education ("CSEs") are responsible for developing appropriate IEPs. N.Y. Educ. Law § 4402(1)(b)(1).

Any parent who thinks that the school district is failing to provide his or her child a FAPE may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district. 20 U.S.C. § 1412(a)(10)(C)(ii). However, parents pursue this option at their financial risk: Reimbursement will be granted only if (1) the proposed IEP failed to provide the student with an

4

appropriate public education; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations support the parent's claim. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370, 374 (1985); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993) (reaffirming *Burlington*); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) (reaffirming *Carter* and *Burlington*).  This analysis is also known as the *Burlington*/*Carter* test. *R.E.*, 694 F.3d at 185.

To seek tuition reimbursement, a parent must file a "due-process complaint," which entitles him or her to an "impartial due process hearing" before an IHO.  20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1).  Under New York law, the school district bears the burden of proof, "including the burden of persuasion and burden of production," to establish that its proposed IEP provided the child a FAPE, while the parent bears the burdens of persuasion and production regarding the appropriateness of the private placement.  N.Y. Educ. Law § 4404(1)©.[2]  But to the extent that a court "must determine whether the state

_____

[2] Under New York law,

> [t]he board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition

5

administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 n.3 (2d Cir. 2012). Either party may appeal the IHO's decision to an SRO, N.Y. Educ. Law § 4404(2), whose determination may in turn be appealed by bringing a civil action in either state or federal court, *id.* § 4404(3)(a); 20 U.S.C. § 1415(i)(2)(A).

## FACTUAL AND PROCEDURAL BACKGROUND

Reyes's son, R.P., is a nineteen-year-old autistic student with deficits in cognitive functioning; receptive, expressive, and pragmatic language abilities; and fine and gross motor skills. In addition to autism, he has been diagnosed with sensory integration dysfunction, moderate mental retardation, and attention-deficit/hyperactivity disorder. R.P.'s sensory needs are significant: If he does not receive various kinds of sensory input at regular intervals throughout the day (a "sensory diet"), he is unable to maintain control over his

---

reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement.

N.Y. Educ. Law § 4404(1)(c).

6

behavior and may speak in a very loud voice, press on his eyes, rock his body back and forth, knock over objects, or pace.

R.P. was sixteen years old during the 2010-2011 school year at issue and had been attending the Rebecca School in Manhattan, "a therapeutic private school for students with neurodevelopmental delays in relating and communicating," since May 2007. Compl. ¶ 48. DOE paid for his placement at the Rebecca School in the 2009-2010 school year pursuant to a November 19, 2010, IHO decision.

On May 17, 2010, a CSE meeting was convened to develop R.P.'s IEP for the 2010-2011 school year. Reyes, a DOE psychologist named Rose Fochetta, a DOE special education teacher, and a parent member[3] attended. R.P.'s then-teacher at the Rebecca School participated by telephone. To determine R.P.'s abilities and instructional needs, the CSE team considered a classroom observation conducted on November 12, 2009; two psychological evaluations, conducted on December 23, 2009, and January 26, 2010; and a May 2010 progress

---

[3] New York law requires that the CSE include an "additional parent," not employed by the school district, who resides in the area and whose child is either a student with a disability, a student formerly classified as disabled, or a disabled child who has recently graduated. N.Y. Educ. Law § 4402(1)(b)(1)(a).

report regarding R.P.'s performance at the Rebecca School for the 2009-2010 school year.

The IEP produced by the CSE team recommended that R.P. be placed in a special "6:1:1" class (six students, one special education teacher, and one classroom paraprofessional) with various related services, including occupational therapy, speech and language therapy, physical therapy, and counseling. The IEP also recommended that R.P. be assigned a one-on-one ("1:1") paraprofessional for three months "to ease the transition" from private to public school.

On or about June 15, 2010, DOE sent Reyes a Final Notice of Recommendation offering R.P. a seat at P.S. 79. Reyes visited P.S. 79 on June 25, 2010, with Rebecca School occupational therapy supervisor Mary Wiener. On that visit, Reyes and Wiener toured the school, observed two 6:1:1 classrooms, spoke with classroom teachers and an occupational therapist, and visited the therapy room and the cafeteria. Both classes that Reyes and Wiener observed employed the TEACCH[4] methodology, with students seated at individual

---

[4] TEACCH is the acronym for a method of teaching autistic children called "Treatment and Education of Autistic and Related Communication-Handicapped Children." *See M.H.*, 685 F.3d at 259 (Appendix). For a description of the technique, see, for example, Autism Web: A Parent's Guide to Autism Spectrum Disorders, *available at* http://www.autismweb.com/teacch.htm (last visited July

workstations and working independently. Neither classroom teacher was familiar with the term "sensory diet," a personalized regimen of activities that provides the sensory input a child like R.P. requires to stay focused throughout the day. Reyes and Wiener were also told that P.S. 79 did not have a "sensory gym," a facility with specialized equipment that provides therapeutic sensory inputs. They observed tables, mats, and balls, but no swings or other equipment designed to create a sense of movement (referred to as "vestibular" equipment). When Wiener asked about the absence of such equipment, she was told that the school had none. As Wiener testified, she and Reyes were also told by a P.S. 79 occupational therapist that the school was "currently understaffed for occupational therapists and that they were using contractors, but that not all of the children's mandates were being met." Hearing Tr. at 258, J.A. 567.

Reyes ultimately rejected the proposed placement because she thought the school's TEACCH methodology was not appropriate for R.P., the school did not provide an adequate sensory diet or sensory equipment, the school did not provide an adequate level of individual attention, and the school was unable to meet R.P.'s related services mandate. On June 14, 2010, Reyes enrolled R.P. in a ten-month program at the Rebecca School for the 2010-2011 school year.

22, 2014).

9

Reyes filed the due process complaint that initiated this action on March 4, 2011. On April 29, 2011, the IHO issued an Order on Pendency requiring that DOE pay R.P.'s tuition at the Rebecca School during the course of the litigation. *See* 20 U.S.C. § 1415(j) (providing that "during the pendency of . . . proceedings . . . the child shall remain in the then-current educational placement of the child").

An impartial hearing was held over four days between April 28, 2011, and July 21, 2011. At the hearing, Fochetta and Anne Duquette, a teacher at P.S. 79, testified on DOE's behalf. Fochetta opined that R.P. "require[d] a lot of support," but that DOE's proposed placement of a 6:1:1 class with a 1:1 transitional paraprofessional–a service that could have been "continue[d] . . . if it was warranted"–"c[ould] promote progress." Hearing Tr. at 76, J.A. 359; *id.* at 74, J.A. 357. Duquette described how she implemented the TEACCH methodology in her classroom and explained the tailored strategies that she would have employed to meet R.P.'s particular needs. Hearing Tr. at 115-22, J.A. 398-405; *id.* at 126-38, J.A. 409-21.

Reyes testified on her own behalf, as did five witnesses from the Rebecca School. Tina McCourt, the School's Program Director, detailed R.P.'s significant sensory needs and expressed her skepticism that R.P. could make progress in a

10

6:1:1 class or if instructed using the TEACCH methodology. She also asserted that terminating the transitional paraprofessional's services after only three months would confuse R.P. by ending a relationship upon which he had become dependent. Wiener described and criticized the lack of sensory equipment available at P.S. 79, while R.P.'s occupational therapist, speech pathologist, and teacher at the Rebecca School further explained his needs and how the school's staff met them.

The IHO concluded in a decision dated September 20, 2011, that DOE had denied R.P. a FAPE. She found that the 6:1:1 class was inappropriate to meet R.P.'s needs and that it was "insufficient" to augment that ratio by providing 1:1 paraprofessional support for three months only. IHO Decision, No. 132427, at 11 (Sept. 20, 2011), J.A. 198. Noting that DOE's argument that the paraprofessional's services could have been extended beyond three months was merely "speculative," the IHO declined to determine whether a 6:1:1 class with 1:1 paraprofessional support for the entire school year would have been sufficient. *Id.* The IHO further found "no proof that the resources available at [P.S. 79] would meet [R.P.'s] significant sensory needs" or that the TEACCH methodology "[wa]s individualized to meet [R.P.'s] needs." *Id.* at 12, J.A. 199. The IHO concluded that R.P.'s placement at the Rebecca School was appropriate and that

11

there was no equitable impediment to tuition reimbursement.  She therefore ordered DOE to pay R.P.'s Rebecca School tuition.

On September 27, 2011, DOE appealed the IHO's decision to the New York State Education Department's Office of State Review.  On November 22, 2011, the SRO overturned the IHO's decision, finding that DOE had offered R.P. a FAPE for the 2010-2011 school year.  The SRO found that the record did not support the IHO's determination that the 6:1:1 class was inadequate to address R.P.'s needs, and further determined that, even if the record established that R.P. required 1:1 paraprofessional services, the IEP could have been modified to provide those services.  In support of this conclusion, the SRO cited the testimony of Fochetta, the DOE psychologist, that the CSE recommended three months of 1:1 paraprofessional support with the "understanding" that R.P.'s need for the service would be reassessed and that the service would be extended as needed.  SRO Decision, No. 11-124, at 13 (Nov. 22, 2011), J.A. 180.  The SRO also concluded that Reyes's "concerns regarding [P.S. 79's] ability to address [R.P.'s] sensory needs, and the appropriateness of the TEACCH methodology utilized . . . [were] not supported by the preponderance of the evidence contained in the hearing record."  *Id.* at 18, J.A. 185.  The SRO did not reach the IHO's findings regarding

12

the appropriateness of R.P.'s placement at the Rebecca School or the balance of the equities.

Reyes appealed from the SRO's decision to the United States District Court for the Southern District of New York. The parties cross-moved for summary judgment. On December 11, 2012, following oral argument, the district court upheld the conclusions of the SRO. *Reyes v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2113 (WHP), 2012 WL 6136493, 2012 U.S. Dist. LEXIS 175329 (S.D.N.Y. Dec. 11, 2012). The court concluded that although the SRO's reliance on Fochetta's testimony that the IEP could be modified was impermissible, the remainder of the evidence supported his determination that the IEP was substantively adequate. *Id.*, 2012 WL 6136493 at *6, 2012 U.S. Dist. LEXIS 175329 at *16-*17. The district court also upheld the SRO's conclusions that P.S. 79 could meet R.P.'s sensory needs and that the TEACCH methodology was appropriate for R.P., and declared any burden shifting on the part of the SRO "inconsequential." *Id.*, 2012 WL 6136493 at *5, *7-*8, 2012 U.S. Dist. LEXIS 175329 at *16, *19-*23. Because the district court deferred to the SRO's conclusion that R.P. had been offered a FAPE, it did not consider the appropriateness of the Rebecca School placement or the balance of the equities. *Id.*, 2012 WL 6136493 at *8, 2012 U.S. Dist. LEXIS 175329 at *23.

13

Reyes appeals.

**DISCUSSION**

I. Standard of Review

A district court's grant of summary judgment in an IDEA case is reviewed *de novo*. *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009). After conducting an independent review, this Court must base its decision on the preponderance of the evidence, giving "'due weight'" to the state administrative decision because "the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-113 (2d Cir. 2007) (quoting *Rowley*, 458 U.S. at 206, 208).

In deciding what weight is due to an IDEA administrative decision, the analysis often "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive." *M.H.*, 685 F.3d at 244. Such considerations include the quality and thoroughness of the reasoning, the type of determination under review, and whether the decision is based on the administrative body's familiarity with the evidence and the witnesses. *Id.* "When an IHO and the SRO reach conflicting conclusions, we defer to . . . the SRO's decision." *R.E.*, 694 F.3d at 189 (internal quotation marks and brackets omitted).

But because the administrative decision-maker's "factual findings must be 'reasoned and supported by the record' to warrant deference," *M.H.*, 685 F.3d at 241 (quoting *Gagliardo*, 489 F.3d at 114), if a court concludes that an SRO's decision is inadequately reasoned, "a better-reasoned IHO opinion may be considered instead," *R.E.*, 694 F.3d at 189.

## II. Issues for Judicial Review

Reyes argues on appeal that the district court erred in finding that any burden shifting by the SRO was "inconsequential" and in deferring to the SRO's findings that (1) the 6:1:1 class with three months of 1:1 paraprofessional support was substantively adequate, (2) P.S. 79 was capable of addressing R.P.'s sensory needs, and (3) the TEACCH methodology was appropriate for R.P.

### A. Burden Shifting

In New York, "the local school board bears the initial burden of establishing" the IEP's validity. *Id.* at 184; *see* N.Y. Educ. Law § 4404(1)©. The IDEA, by contrast, is silent on the burden of proof; the Supreme Court has interpreted the statute to place the burden of challenging an IEP on the party bringing the challenge. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005). It remains an open question whether states may deviate from the IDEA's default

rule, as New York does, by placing the initial burden on the school board. *See id.* at 61-62 (declining to decide the issue).

We need not answer that question here. "Because the [SRO] . . . concluded that the IEP[ was] proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the . . . [SRO] erred is properly understood to fall on the plaintiff[]." *M.H.*, 685 F.3d at 225 n.3. Moreover, because the standard here is preponderance of the evidence, "which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise." *Id.* As we explain below, we think that Reyes has met her burden on appeal.[5]

---

[5] The language of the SRO's decision does suggest that he required Reyes to prove that the IEP was adequate, thereby shifting the burden in contravention of New York law. In particular, the passage regarding P.S. 79's ability to meet R.P.'s sensory needs and its use of the TEACCH methodology suggests that the SRO required Reyes to prove that R.P.'s IEP was inadequate:

> I find *the parent's concerns* regarding the assigned school's ability to address the student's sensory needs, and the appropriateness of the TEACCH methodology utilized in the assigned 6:1+1 special class to address the student's educational needs *are not supported by the preponderance of the evidence* contained in the hearing record.

SRO Decision at 18 (emphasis added), J.A. 185. While we do not address whether New York's assignment of the burden of proof is proper under *Schaffer*, the SRO's failure to adhere to state law decreases our confidence in the thoroughness of his decision.

*B. Challenges to the IEP's Substantive Adequacy*

Reyes's contentions that the 6:1:1 class with three months of 1:1 paraprofessional support was inadequate, that P.S. 79 was incapable of addressing R.P.'s sensory needs, and that the TEACCH methodology was inappropriate for R.P. all challenge the substantive adequacy of R.P.'s IEP. For this reason, if Reyes prevails on any one of these arguments, DOE has failed to prove that its proposed IEP provided R.P. with a FAPE. *See R.E.*, 694 F.3d at 190.

1. *The Class Ratio and the "Transitional" Paraprofessional*. Reyes argues that the class ratio specified in the IEP, comprising both the 6:1:1 placement and the dedicated paraprofessional for three months only, was inappropriate to meet R.P.'s academic and behavioral needs. As a threshold matter, we must decide whether the SRO improperly relied on testimony asserting that R.P.'s IEP could have been modified to include additional services. Because we agree with the district court that the SRO's reliance on this evidence was improper, *see Reyes*, 2012 WL 6136493, at *6, 2012 U.S. Dist. LEXIS 175329, at *16-*17, we consider whether the IEP as written was sufficient to provide R.P. with a FAPE.

We first conclude that the SRO's reliance on testimony that the IEP could be modified to extend the paraprofessional's services was improper under *R.E. v. New York City Department of Education*, 694 F.3d at 174. *R.E.* prohibits using

17

retrospective testimony[6] "to materially alter a deficient written IEP by establishing that the student would have received services beyond those listed in the IEP." *Id.* "The purpose of discouraging reliance on . . . 'retrospective' testimony . . . is to ensure that parents can make placement decisions for their children based solely on the information made available to them by the Department at the time of the placement decision." *B.R. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 676-77 (S.D.N.Y. 2012) (citing *R.E.*, 694 F.3d at 186). At the time when she had to decide where to place R.P., Reyes could not know whether DOE would offer R.P. the services of a paraprofessional for more than the three months specified in the IEP. We therefore think it contrary to the logic of *R.E.*, and of the IDEA itself, to penalize her for relying upon the IEP's description of services in making the placement decision.

DOE argues that the testimony here was not retrospective because the IEP reflected the "understanding" that R.P.'s needs would be reevaluated at the end of three months and his IEP amended to extend the paraprofessional's services if they were still required. Appellee Br. at 32-34. We think it inappropriate,

_____

[6] "Retrospective testimony" is a term of art originated in this Circuit in 2012 to refer to testimony about additional services that *would have* been provided had the parent accepted the school district's proposed placement. *R.E.*, 694 F.3d at 185.

however, to take into account the possibility of mid-year amendments in determining whether an IEP as originally formulated was substantively adequate. The IDEA provides for the amendment of any IEP in the middle of the school year with the parent's consent and according to a statutorily prescribed process. 20 U.S.C. § 1414(d)(3)-(4). New York law also provides a procedure for making such modifications. N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(g). An IEP that contemplates or implies the possibility of amendments is therefore not substantively different from an IEP that is silent on the issue. If the school district were permitted to rely on the possibility of subsequent modifications to defend the IEP as originally drafted, then it could defeat any challenge to any IEP by hypothesizing about what amendments could have taken place over the course of a year.

Such an approach would, we think, undermine a core purpose of the IDEA: to ensure an orderly annual review of a child's needs and to provide for them in a comprehensive plan. The IDEA requires that each IEP include "a statement of measurable *annual* goals, including academic and functional goals, designed to . . . enable the child to . . . make progress." 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa) (emphasis added). It also mandates that special education and related services be provided to allow the child "to advance appropriately

toward attaining the annual goals." *Id.* § 1414(d)(1)(A)(i)(IV)(aa); *see also* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(d)(2)(iii) (requiring that the IEP include "[m]easurable annual goals"). The IDEA further requires that each child's IEP be reviewed "periodically, but not less frequently than annually," 20 U.S.C. § 1414(d)(4)(A)(i), and be "in effect" "[a]t the beginning of each school year," *id.* § 1414 (d)(2)(A); *see also* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(f) (requiring that IEPs be "reviewed and, if appropriate, revised, periodically but not less than annually"). If we were to accept DOE's arguments relying on the possibility that there could be a later amendment to R.P.'s IEP, then we would effectively require every parent to consider the likelihood of mid-year amendments in evaluating his or her child's IEP. This approach would create significant uncertainty regarding what special education and related services the child would actually receive over the course of the academic year, undermining the tuition reimbursement system and the IDEA's promise of a free appropriate public education for every child with a disability. *R.E.*, 694 F.3d at 186 ("In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision."). We therefore do not take into account the possibility of mid-year amendments when assessing the substantive adequacy of the IEP. For this

reason, we understand R.P.'s IEP to provide only for a 6:1:1 student-faculty-paraprofessional ratio, with additional 1:1 paraprofessional support terminating at the end of a three-month transition period.

In considering the substantive adequacy of R.P.'s IEP, we recognize that school districts are not required to "maximize the potential" of students with disabilities, but instead must offer only "a basic floor of opportunity." *Rowley*, 458 U.S. at 200 (internal quotation marks omitted). School districts do this when they formulate an IEP that is "reasonably calculated to enable the child to receive educational benefits," *id.* at 207, that is, "likely to produce progress, not regression," *Walczak*, 142 F.3d at 130 (internal quotation marks omitted).

The SRO, rejecting the IHO's determination, did not find support in the record for Reyes's argument that R.P. "required 1:1 paraprofessional services extended beyond three months in order to receive educational benefits from the district's recommended program." SRO Decision at 13, J.A. 180. The SRO based his conclusion on McCourt's testimony that R.P. did not have a dedicated paraprofessional at the Rebecca School. However, McCourt also testified that R.P. did not require a one-on-one paraprofessional in that placement because the school met his needs with its 8:1:3 staffing ratio, which effectively provided one professional for every two students. The fact that R.P. did not need a dedicated

21

paraprofessional in a 2:1 environment does not necessarily indicate he would not need one in DOE's less staff-intensive 3:1 environment. Indeed, McCourt testified that the 6:1:1 placement "would not be a good placement for [R.P.]" because it offered only a 3:1 model, and R.P.'s 2009-2010 teacher thought that the 6:1:1 placement was "too large" for him. Hearing Tr. at 209, J.A. 492; *id.* at 88, J.A. 371; CSE Meeting Minutes (May 20, 2010), J.A. 1014. And although the SRO cited a Rebecca School progress report stating that R.P.'s ability to remain regulated for longer periods of time had improved, as had his communication skills and ability to ask for help to regulate himself, McCourt's testimony made clear that, in her view, R.P. nonetheless required sensory breaks about every 20 minutes to be "able to engage and attend and learn." Hearing Tr. at 205, J.A. 488.

The SRO also pointed to the November 2009 classroom observation which detailed R.P.'s "abilities to answer questions posed by personnel, ask a peer a question, accept redirection and prompts related to activities, and to determine which activities were on the classroom schedule for the day." SRO Decision at 11, J.A. 178. Yet these interactions took place in a classroom containing at first five students and three adults, and later seven students and five adults. And over the course of the thirty-minute evaluation, Fochetta, the DOE psychologist who conducted the observation, noted that R.P. was rocking back and forth on six

22

separate occasions and had to be redirected toward class activities several times. Even Fochetta, on whose testimony the SRO principally relied, recognized that R.P. required a 1:1 paraprofessional at least transitionally and conceded that "there [wa]s the potential for him needing it longer" than three months, which "was a minimum." Hearing Tr. at 73, J.A. 356; *id.* at 102, J.A. 385.

In light of this evidence, we defer to the IHO's well-reasoned determination that R.P. required the services of a 1:1 paraprofessional for longer than the transitional three-month period afforded him by his IEP. The class ratio specified in R.P.'s IEP therefore constituted a denial of FAPE.

2. *R.P.'s Sensory Needs and TEACCH Methodology.*[7] Reyes also argues that P.S. 79 was unable to meet R.P.'s sensory needs and that the TEACCH methodology employed in every 6:1:1 class at the school would not enable R.P to receive educational benefits. Because we find for Reyes on another ground, we need not and do not address these issues. However, we do note that, to the extent that the SRO relied on retrospective testimony[8] to dismiss Reyes's concerns

---

[7] *See* note 3, *supra*, for definition.

[8] Such testimony included Duquette's representation that she would have tailored her implementation of the TEACCH methodology to R.P.'s individual needs, *see Reyes*, 2012 WL 6136493, at *8, 2012 U.S. Dist. LEXIS 175329, at *22, and McCourt's statement that R.P.'s "independence in the [Rebecca S]chool ha[d] gotten much better," SRO Decision at 17, J.A. 184, in the school year following

23

about the TEACCH methodology, such reliance was inappropriate under *R.E. v. New York City Department of Education*, 694 F.3d at 185-87.

## CONCLUSION

Because we conclude that the Department of Education failed to offer R.P. a free appropriate public education, we REVERSE the judgment of the district court and REMAND the case to the district court to consider the appropriateness of Reyes's private placement and the balance of the equities.

---

Reyes's rejection of the DOE placement.

**APPENDIX**

**Glossary of Acronyms**

CSE        Local Committee on Special Education

DOE        New York City Department of Education

FAPE       Free Appropriate Public Education

IDEA       Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*

IEP        Individualized Education Program

IHO        Impartial Hearing Officer

R.P.       Son of plaintiff Reyes

SRO        State Review Officer

TEACCH     Treatment and Education of Autistic and Related
           Communication-Handicapped Children, a method for teaching
           children with autism