Cruz v Banks (2026 NY Slip Op 00821)

Cruz v Banks

2026 NY Slip Op 00821

Decided on February 17, 2026

Court of Appeals

Singas, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 17, 2026

No. 1 

[*1]Neysha Cruz, & c., Appellant,
vDavid C. Banks et al., Respondents.

Rory J. Bellantoni, for appellant.
D. Alan Rosinus, Jr., for respondents.

SINGAS, J.

We have accepted a certified question from the United States Court of Appeals for the Second Circuit regarding the proper interpretation of 8 NYCRR 200.6 (h) (4), which pertains to classroom sizes and staffing levels in special classes for students with disabilities. We hold that the regulation sets forth a list of mutually exclusive alternatives, and that a student's committee on special education (CSE) must therefore select the listed alternative that best meets a student's individual needs. We answer the certified question accordingly.I.
Congress enacted the Individuals with Disabilities Education Act (IDEA) to promote the education of students with disabilities and to ensure the availability of an individualized special education program designed to meet those students' "unique needs" (School Comm. of Burlington v Department of Ed. of Mass., 471 US 359, 367 [1985] [internal quotation marks omitted]). The IDEA authorizes participating states to issue regulations consistent with its goals, giving states a central role in its administration (see generally 20 USC § 1407; see also 20 USC § 1412). New York has "adopted legislation intended to complement the [f]ederal program and comply with [the IDEA's] requirements" (Matter of Northeast Cent. School Dist. v Sobol, 79 NY2d 598, 603 [1992], citing Education Law § 4401 et seq.).
In turn, the New York State Department of Education (State DOE) has adopted regulations implementing this legislation (see 8 NYCRR part 200). That includes 8 NYCRR 200.6, entitled "Continuum of services," which details [*2]requirements for various types of special education services, including special classes (see 8 NYCRR 200.6 [h]). Subdivision (h) (4) provides:
"Special class size for students with disabilities. The maximum class size for those students whose special education needs consist primarily of the need for specialized instruction which can best be accomplished in a self-contained setting shall not exceed 15 students, or 12 students in a [s]tate-operated or [s]tate-supported school, except that:
"(i) The maximum class size for special classes containing students whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students, shall not exceed 12 students, with one or more supplementary school personnel assigned to each class during periods of instruction.
"(ii)
"(a) The maximum class size for special classes containing students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention, shall not exceed six students, with one or more supplementary school personnel assigned to each class during periods of instruction.
"(b) The maximum class size for special classes containing students whose management needs are determined to be intensive, and requiring a significant degree of individualized attention and intervention, shall not exceed eight students, with one or more supplementary school personnel assigned to each class during periods of instruction.
"(iii) The maximum class size for those students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment, shall not exceed 12 students. In addition to the teacher, the staff/student ratio shall be one staff person to three students. The additional staff may be teachers, supplementary school personnel and/or related service providers" (8 NYCRR [h] [4]).[FN1]
Under the IDEA, states receiving federal funds must provide all students with disabilities a "free appropriate public education" (FAPE) (20 USC § 1412 [a] [1] [A]). "A FAPE consists of special education and related services tailored to meet the unique needs of a particular [student]," and is documented through an individualized education program (IEP) (Reyes ex rel. R.P. v New York City Dept. of Educ., 760 F3d 211, 214 [2d Cir 2014] [internal quotation marks omitted]; see 20 USC §§ 1400 [d] [1] [A]; 1401 [9]). The IEP "sets out the [student]'s present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the [student] to meet those objectives" (Honig v Doe, 484 US 305, 311 [1988]; see 20 USC §§ 1401 [14]; 1414 [d] [1] [A] [i]).
In New York, a CSE comprising, among others, a student's parents, a special education teacher, a school psychologist, and a school board representative, and "other persons having knowledge or special expertise regarding the student," is responsible for developing the student's IEP each year (see Education Law § 4402 [1] [b] [i] [a]). The CSE must exercise its knowledge and expertise to recommend special education services from the various options in [*3]8 NYCRR 200.6 that are appropriate to advance the student's annual goals and further their education (see 8 NYCRR 200.4 [d] [2] [v] [a]; see also Education Law § 4402 [1] [b] [3] [b]; [2] [a]). This includes a recommendation as to the appropriate class size for special classes (see 8 NYCRR 200.4 [d] [2] [v] [b] [2]). After developing an initial IEP, the CSE must convene "periodically but not less than annually to determine if the annual goals for the student are being achieved" and, if necessary, amend the student's IEP (id. § 200.4 [f]-[g]).

A parent who believes this IEP is legally inadequate may enroll the student in a private school and seek reimbursement from the public school district by filing a "due process complaint" setting forth the IEP's alleged deficiencies (see Education Law § 4404 [1]; 20 USC § 1412 [a] [10] [C] [ii]). If the parties do not then resolve the dispute, they proceed to a hearing before an administrative impartial hearing officer (IHO) (see Education Law § 4404 [1]). To demonstrate entitlement to tuition reimbursement, a parent must show that (1) the public school district failed to offer the student a FAPE, (2) the student's private placement is appropriate, and (3) the equities support reimbursement (see Florence County School Dist. Four v Carter, 510 US 7, 12-13 [1993]; Burlington, 471 US at 373-374). Either party may appeal the IHO's decision to an administrative state review officer (SRO), whose decision is then subject to judicial review in Supreme Court or a Federal District Court (see Education Law § 4404 [2]-[3]).II.
Plaintiff is the mother of O.F., who has cerebral palsy, visual impairment, a seizure disorder, and scoliosis. In 2018, O.F. began attending the International Institute for the Brain (iBRAIN), a private school. In 2020, a CSE finalized an IEP for O.F. recommending that he be placed in a 12-month program in a 6:1:1 class in a specialized public school. This IEP also recommended that O.F. receive numerous other related services. Due to the COVID-19 pandemic, O.F. did not attend school during the 2020-2021 school year until June 2021, when plaintiff reenrolled him at iBRAIN. In 2021, the CSE determined during its annual review that a 12:1+(3:1) placement "would be more appropriate" than the prior IEP's 6:1:1 recommendation, given O.F.'s lack of progress over the prior school year and need for "more individualized and more specialized instruction with a higher student-to-teacher ratio." The CSE considered and rejected other class options as inappropriate for O.F.
Plaintiff filed a due process complaint challenging, among other things, the 2021 IEP's 12:1+(3:1) classroom recommendation. Plaintiff sought payment from the New York City Department of Education (City DOE) for O.F.'s iBRAIN tuition. After a hearing, the IHO concluded that a 12:1+(3:1) class was appropriate for O.F. On administrative appeal, the SRO upheld this finding.[FN2]
Plaintiff then commenced this action in the United States District Court for the Southern District of New York against the City DOE, and the parties cross-moved for summary judgment. The District Court agreed with the SRO and granted the City DOE's motion (see 2024 WL 1309419, *10, 2024 US Dist LEXIS 55396, *30 [SD NY, Mar. 27, 2024, Case No. 1:22-cv-09220 (JLR)]). As relevant here, the District Court, noting the SRO's finding that O.F. had both "highly intensive" management needs and "severe multiple disabilities," concluded that O.F.'s placement in a 12:1+(3:1) class was "appropriate" (2024 WL 1309419, *8, 2024 US Dist LEXIS 55396, *22). In reaching this conclusion, the court cited a Second Circuit summary order construing 8 NYCRR 200.6 (h) (4) as setting forth a "continuum of classroom options" of which the 12:1+(3:1) configuration is the "most supportive" (2024 WL 1309419, *7-8, 2024 US Dist LEXIS 55396, *20-22, quoting Navarro Carrillo v New York City Dept. of Educ., 2023 WL 3162127, *3, 2023 US App LEXIS 10533, *5 [2d Cir, May 1, 2023, No. 21-2639]). Plaintiff appealed.
The Second Circuit certified the following question for our review: "When a student is covered by more than one class size regulation under [8 NYCRR 200.6 (h) (4)], do the varying restrictions serve as distinct requirements that must be independently fulfilled or as a list of class size options from which the DOE may pick?" (134 F4th 687, 698-699 [2d Cir 2025]).[FN3][*4]III.
Administrative regulations are generally subject to the same interpretive rules and canons of construction as statutes (see Matter of ATM One, LLC v Landaverde, 2 NY3d 472, 476-477 [2004]). Neither party has identified an official agency interpretation of the disputed regulatory text that might be entitled to deference (cf. Matter of LL 410 E. 78th St. LLC v Division of Hous. & Community Renewal, 44 NY3d 232, 237 [2025]; Andryeyeva v New York Health Care, Inc., 33 NY3d 152, 174-176 [2019]). We therefore review de novo the regulation's text, structure, purpose, and history to discern the State DOE's intent in promulgating it (see Matter of Peyton v New York City Bd. of Stds. & Appeals, 36 NY3d 271, 279-280 [2020]; Matter of Shannon, 25 NY3d 345, 351 [2015]).A.
We start with the text (see Lubonty v U.S. Bank N.A., 34 NY3d 250, 255 [2019]). 8 NYCRR 200.6 (h) provides that the "following standards shall be used in the provision of special classes for students with disabilities." Paragraph (4) then states that for students "whose special education needs consist primarily of the need for specialized instruction" that "can best be accomplished in a self-contained setting," the "maximum class size" "shall not exceed 15 students, or 12 students in a [s]tate-operated or [s]tate-supported school"—seemingly setting a default requirement for the size of these classes (8 NYCRR 200.6 [h] [4]). This default requirement applies "except" in four enumerated circumstances (id.). First, for classes with "students whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom," "the maximum class size . . . shall not exceed 12 students, with one or more supplementary school personnel assigned to each class" (id. § 200.6 [h] [4] [i]). Second, for classes with "students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention," "the maximum class size . . . shall not exceed six students with one or more supplementary school personnel assigned to each class" (id. § 200.6 [h] [4] [ii] [a]). Third, for classes with "students whose management needs are determined to be intensive, and requiring a significant degree of individualized attention and intervention," "the maximum class size . . . shall not exceed eight students, with one or more supplementary school personnel assigned to each class" (id. § 200.6 [h] [4] [ii] [b]). Finally, for "students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment," "the maximum class size . . . shall not exceed 12 students" and "the staff/student ratio shall be one staff person to three students" (id. § 200.6 [h] [4] [iii]). There is no conjunction between any of these four provisions, and each ends with a period.
By their text, the first three exceptions to the default requirement thus appear to mandate an extra staff member when a student requires individualized attention that cannot be provided under the default requirement, and to mandate progressively smaller class sizes based on the degree of individual attention that the student requires: the maximum class size is 12 if those needs "interfere with the instructional process," eight if those needs are "intensive" and require a "significant degree of individualized attention," and six if those needs are "highly intensive" and necessitate a "high degree of individualized attention and intervention" (id. § 200.6 [h] [4] [i]-[ii]). By contrast, the fourth exception does not state that it applies to students requiring more or less attention than those described in the preceding exceptions. Rather, the fourth exception applies when a student has "severe multiple disabilities" and their IEP "consist[s] primarily of habilitation and treatment" (id. § 200.6 [h] [4] [iii]). Based on the regulation's text, including its lack of conjunctive language, it is possible to interpret the fourth exception as either an alternative to the first three requirements, or as an additional requirement that must also be satisfied.
The structure of the regulation indicates that the State DOE intended the former. Initially, it would be counter-intuitive, in a list of four things, to list three that are clearly intended as alternatives to one another, and then a fourth that is an additional requirement to the preceding three. This interpretation would require schools not only to operate separate classrooms with each of the five configurations expressly contemplated in the regulation, but also to operate additional classrooms with 6:1+(3:1) and 8:1+(3:1) configurations—which the regulation's text nowhere describes—for students covered by both the fourth exception and either the second or the third. It seems unlikely that the agency meant to tacitly require these more resource-intensive configurations based on the cumbersome intersection between multiple items in the list. If that is what the agency intended, it would have been far simpler to list those additional configurations separately. Similarly, it is reasonable to think that the vast majority of students with "severe multiple disabilities" who primarily need "habilitation and treatment" under the fourth exception (id.) also have "highly intensive" or "intensive" management needs requiring a "high" or "significant" "degree of individualized attention" under the second or third exception (id. § 200.6 [h] [4] [ii] [a], [b]). Again, if the agency [*5]wanted students with multiple disabilities principally to be in 6:1+(3:1) or 8:1+(3:1) classrooms, it likely would have said so, rather than imposing a 12-person class limit that applies to relatively few, if any, students.B.
Along with the text and structure, the regulation's history provides further support for reading the regulation as imposing mutually exclusive alternatives (see People v Iverson, 37 NY3d 98, 103 [2021] [courts may look to history in a manner consistent with text]). Before 1982, 8 NYCRR former 200.4 (b) applied the "special class" requirements based on the nature of a student's disability rather than their particular needs. For example, classes for students with autism were capped at five students with an additional staff member (see id. former § 200.4 [b] [4] [iv]-[v]). This version of the regulation included classroom requirements ranging from 18:1 to 5:1:1 (see id. former § 200.4 [b]). Notably, it also contained a 12:1+(3:1) requirement—but only for students whose "combination" of disabilities rendered the other options "not adequate for the[ir] special education needs and services" (id. former § 200.4 [b] [5]). Under this version of the regulation, then, the State DOE unambiguously required 12:1+(3:1) classrooms as an alternative for certain students; not as an additional requirement.
In 1982, the State DOE overhauled the regulation and "reordered and expanded" the list of staffing requirements (Agency Action, NY St Reg, Apr. 21, 1982 at 7). In doing so, the agency explained that "[t]he management needs to be considered in selecting class sizes [wa]s broadened to include management needs related to academic and/or physical needs," and that "[a] provision was [being] added to ensure that paraprofessionals required for certain classes of pupils be present during periods of instruction" (id.). The revised regulation "deleted the former requirements for the grouping of [students] according to their identified" disability, in favor of a "placement . . . based upon . . . needs" (Bruce G. Sheffler, Education of Handicapped Children: The IEP Process and the Search for an Appropriate Education, 56 St John's L Rev 81, 101 [Fall 1981]). According to the agency, this change was intended to "allow for [students] to be better served within the special education programs and provide districts the necessary flexibility to meet pupil needs without being inhibited by arbitrary grouping requirements" (New York State Department of Education, Education of Children with Handicapping Conditions, A Revision of Regulations at ES 3.11 [Jan. 8, 1981]). Tellingly, the agency explained that under the 1982 revisions, once a "self-contained program option[ ]" was selected for a student, "the grouping of [students] within th[at] option[ ] regarding both class size and composition, would be based on the pupil's levels of performance and learning rates" (id. at ES 3.12 [emphasis added]). It similarly characterized the amended regulation as setting out special class requirements "according to . . . size and composition of . . . classroom groups" (Agency Action, NY St Reg, Apr. 21, 1982 at 7). The agency's use of the phrases "self-contained program options" and "classroom groups" makes plain that it intended the 1982 amendments to set forth mutually exclusive alternatives.
In addition, the agency's initial, draft version of the 1982 amendments imposed a general 12-student class-size cap with two exceptions, including a 6:1+(3:1) classroom for "pupils whose severe to profound" disabilities required "instructional programs consisting primarily of activities of daily living with "additional paraprofessionals" when "appropriate" (Education of Children with Handicapping Conditions, A Revision of Regulations at ES 3.55-3.56). In the draft version, the 6:1+(3:1) requirement—the predecessor of 8 NYCRR 200.6 (h) (4) (iii)—had both the lowest student cap and the highest staff to student ratio (see id.). These features again clearly establish that the agency envisioned this category as an alternative to the regulation's other requirements.
The State DOE then made several changes to the proposed regulation before its adoption. As relevant here, the agency changed "severe to profound" to "severe multiple" and changed the requirement from 6:1+(3:1) to 12:1+(3:1) (see 8 NYCRR 200.6 former [f] [4] [iii], now [h] [4] [iii]). It further added a separate category with a 6:1:1 requirement for those with "highly intensive" "management needs" (see id. § 200.6 former [f] [4] [ii], now [h] [4] [ii] [a]).
Though the final version of the 1982 amendments no longer included the regulation's prior requirement that a student could be placed in a 12:1+(3:1) class only if the other options were unsuitable, nothing in the amendments' history indicates that the agency stopped considering the 12:1+(3:1) ratio as the regulation's most supportive alternative. Instead, comparing the adopted 1982 version to the prior version, it is clear that the amendments simply adapted and reworked the regulation's preexisting categories of "special classes" to be tailored to students' needs. Further supporting this interpretation, the 1982 amendments—unlike the regulation's present version—did not permit "special class[es]" of more than 12 students in any circumstance without a variance (see 8 NYCRR 200.6 former [f] [4], [6]). That the provision for students with multiple disabilities separately articulated the 12-student cap indicates that it was meant as an alternative to the six-student limit in the preceding subsection, rather than an additional [*6]requirement that could be combined with it. Otherwise, the 12-student limit would have been superfluous, and the regulation could have simply listed the 3:1 student to staff ratio requirement instead.
The 1982 amendments largely track the regulation's present version. Notable for our purposes, in 1991, the State DOE added subparagraph (ii) (b)'s current 8:1:1 requirement for students with "intensive" management needs "requiring a significant degree of individualized attention and intervention" (id. § 200.6 former [f] [4] [ii] [b], now [h] [4] [ii] [b]), and raised the default cap on special class sizes from 12 to 15 students (see id. § 200.6 former [f] [4], now [h] [4]) to "provide educational agencies greater flexibility in meeting the individual needs of students" (see Emergency Rule Making, NY St Reg, July 10, 1991 at 6-7). Consistent with the agency's original description of the regulation, the State DOE described the 1991 amendments as permitting schools to "operate an additional special class option" (id. at 7 [emphasis added]), apparently adhering to its longstanding view that regulation's provisions are mutually exclusive alternatives from which a CSE must choose.* * *
In sum, 8 NYCRR 200.6 (h) (4) provides alternatives. We thus conclude that the regulation requires a CSE to exercise its knowledge and expertise to select the listed alternative that would best serve a student's individual needs.
Accordingly, the certified question should be answered in accordance with this opinion.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question answered in accordance with the opinion herein. Opinion by Judge Singas. Chief Judge Wilson and Judges Rivera, Garcia, Cannataro, Troutman and Halligan concur.
Decided February 17, 2026

Footnotes

Footnote 1: We refer to these requirements as [student]:[teacher]:[staff] or [student]:[teacher]+([student]:[staff]). For example, subparagraph (ii) (a) contains a "6:1:1" requirement and subparagraph (iii) contains a "12:1+(3:1)" requirement.

Footnote 2: The IHO ruled, on grounds not relevant to this certified question, that the City DOE denied O.F. a FAPE for the challenged school years and ordered partial tuition reimbursement of the tuition. The SRO reversed this portion of the IHO's determination on administrative appeal.

Footnote 3:
We accepted the question (see 43 NY3d 983 [2025]).