# United States Court of Appeals
# for the Second Circuit

_____

August Term 2024

Argued: December 20, 2024
Decided: April 15, 2025

No. 24-1147

_____

NEYSHA CRUZ, AS PARENT AND NATURAL GUARDIAN OF O.F. AND INDIVIDUALLY,

*Plaintiff-Appellant*,

v.

DAVID C. BANKS, NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendants-Appellees*,

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

Before:      CALABRESI, PARK, and NATHAN, *Circuit Judges*.

Under the Individuals with Disabilities Education Act, Plaintiff-Appellant Neysha Cruz rejected the education plan that Defendant-Appellee New York City Department of Education created for her son O.F. and filed this suit to seek reimbursement of his private school tuition. Principally, Cruz argues that Defendant's decision to place O.F. in a twelve-student classroom violated New

York Codes, Rules, and Regulations Title 8, § 200.6(h)(4)(ii)(a), which requires that "students whose highly intensive management needs are determined to be highly intensive" be placed in classes of six or fewer students. Defendant concedes that the regulation applies, but argues it had the discretion to place O.F. in the twelve-student classroom, because a different regulation, mandating a maximum class size of twelve students for students with "severe multiple disabilities" also applied to him. N.Y. COMP. CODES R. & REGS. tit. 8 § 200.6(h)(4)(iii). We believe this question of New York regulatory interpretation, which involves determining whether § 200.6(h)(4)(ii)(a) and § 200.6(h)(4)(iii) function as distinct requirements or as a menu of options when both apply to a student, is one best suited for resolution by the authoritative state court. We therefore CERTIFY a question to the New York Court of Appeals.

Judge Park dissents in a separate opinion.

_____

> RORY J. BELLANTONI, Brain Injury Rights Group, Ltd, New York, New York, *for Plaintiff*
>
> D. ALAN ROSINUS, JR., of Counsel, MURIEL GOODE-TRUFANT, Acting Corporation Counsel of the City of New York, New York, New York, *for Defendants*

_____

CALABRESI, *Circuit Judge*:

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), Plaintiff-Appellant Neysha Cruz rejected the education program that Defendant-Appellee New York City Department of Education ("the DOE") created for her son, O.F., and now seeks reimbursement for his private school tuition. Among other things, Cruz argues that the DOE's placement of O.F. in a twelve-student classroom violated § 200.6(h)(4)(ii)(a), a New York state regulation which requires

students "whose management needs are determined to be highly intensive" to be placed in classes of no more than six students. N.Y. COMP. CODES R. & REGS. tit. 8 § 200.6(h)(4)(ii)(a). The DOE acknowledges that § 200.6(h)(4)(ii)(a) applies to O.F. but argues that § 200.6(h)(4)(iii), a different regulation requiring a maximum class size of twelve students for students with "severe multiple disabilities," also applies to O.F. *Id.* at § 200.6(h)(4)(iii). Since both regulations apply, the DOE contends it was free to place O.F. in either a twelve- or six-student classroom.

This case ultimately turns on a question of state law: When two class-size regulations, one requiring a class size of twelve or fewer students, § 200.6(h)(4)(iii), the other requiring a class size of six or fewer students, § 200.6(h)(4)(ii)(a), both apply to a student, may the DOE choose which to follow, or must it satisfy both regulations? Because we believe that the New York Court of Appeals should be given the opportunity to address this important and recurring question of New York law, we certify the question to the New York Court of Appeals.

## BACKGROUND

### I.     Statutory and Regulatory Background

Under the IDEA, states receiving federal funds must provide "all children with disabilities" a "free appropriate public education" ("FAPE"). 20 U.S.C.

3

§ 1412(a)(1)(A). "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child," and is documented through an Individualized Education Program ("IEP"). *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 238 (2d Cir. 2015) (quoting *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014)). The IEP "must be likely to produce progress, not regression, and must afford the student with an opportunity greater than mere trivial advancement." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (internal quotation marks omitted and alterations adopted). At the same time, "it need not . . . furnish every special service necessary to maximize each [] child's potential." *Id.* (internal quotation marks omitted).

If a parent believes the state has failed to provide their child with a FAPE, they may choose to "enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 831 (2d Cir. 2014). In New York, "a parent seeking such reimbursement must first pursue that claim in a due process hearing before an [Impartial Hearing Officer ("IHO")] and may appeal an adverse ruling to [a State Review Officer ("SRO")]." *Id.* (internal citations omitted). "Either party may then seek review of the SRO's decision" in court. *Id.* (citing 20 U.S.C.

§ 1415(i)(2)(A)). To determine whether reimbursement is appropriate, we apply the three-part *Burlington/Carter* test[1] and consider: "(1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) . . . the equities." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014).

**II.     Facts and Procedural History**

Cruz is the mother of O.F., a young man who has cerebral palsy, visual impairment, a seizure disorder, and scoliosis. In 2018, O.F. began attending a private school, the International Institute for the Brain ("iBrain"). Cruz challenges the IEPs that the DOE developed for O.F. in May 2020 and June 2021. The May 2020 IEP recommended that O.F. be placed in a 6:1:1 classroom[2] and receive a myriad of supportive services including speech therapy, a 1:1 school nurse, assistive technology devices, physical therapy, specialized transport services including a 1:1 nursing service and a lift bus, and more. The IEP did not include music therapy. It also placed O.F. at the D75 Horan School, a public school. The

---

[1] This test is named after the Supreme Court cases that established it. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).

[2] A 6:1:1 classroom has six students, one teacher, and one classroom paraprofessional. This arrangement is also sometimes represented as "6:1+1." *Navarro Carrillo v. N.Y.C. Dep't of Educ.*, No. 21-2639, 2023 WL 3162127, at *1 n.1 (2d Cir. May 1, 2023) (summary order).

June 2021 IEP was largely the same but recommended a 12:1:4 classroom[3] placement instead of the 6:1:1 placement. Due to the COVID-19 pandemic, O.F. only attended a couple weeks of school at iBrain during the 2020-2021 school year.

On July 6, 2021, Cruz filed a "due process" complaint with the state, arguing that O.F. was denied a free appropriate public education under the May 2020 and June 2021 IEPs, and requesting payment of O.F.'s iBrain tuition and related services for the 2020-2021 and 2021-2022 school years. O.F. then completed his 2021-2022 school year at iBrain.

In March 2022, an Impartial Hearing Officer found that the DOE offered O.F. a FAPE with both IEPs. But it concluded that the recommended placement school, the D75 Horan School, would not be able to implement the IEPs because their school days were too short for O.F. to receive all his required instruction and services. The IHO then determined that iBrain was an appropriate placement and the equities weighed in favor of reimbursement, and ordered payment of O.F.'s tuition. However, the IHO found Cruz's claimed costs to be "excessive" and granted only a partial reimbursement.

---

[3] A 12:1:4 classroom has twelve students, one teacher, and one classroom paraprofessional for every three students, which totals to four paraprofessionals for a full class. This arrangement is also sometimes represented as "12:1+(3:1)." *Carrillo*, 2023 WL 3162127, at *1 n.1.

Seeking full reimbursement, Cruz appealed the decision to a State Review Officer. The DOE cross-appealed, challenging the IHO's finding that it did not offer O.F. a FAPE. The SRO agreed with the IHO that the IEPs offered a FAPE but reversed the IHO's finding that the D75 Horan School could not implement the IEPs. The SRO found that the majority of O.F.'s services could be conducted simultaneously with his education and so his IEPs would fit into Horan's regular school day. Because the DOE offered O.F. a FAPE, the SRO declined to reach the remaining prongs of the *Burlington/Carter* test.

Cruz then brought this action in the Southern District of New York, and both parties moved for summary judgment. The district court agreed with the SRO in full and granted summary judgment to the DOE. In particular, the court upheld the SRO's finding that the June 2021 IEP permissibly placed O.F. in a 12:1:4 class. Cruz had argued that pursuant to state regulation, O.F. had to be placed in a classroom with "no more than six" students due to his "highly intensive management needs." The district court agreed that the regulation applied to him but found that another regulation, setting twelve-student maximums for students with "severe multiple disabilities," also applied. Since both regulations applied, the district court held that the DOE could pick between the two classroom

7

maximums, and thus O.F.'s "placement in a 12:1:4 classroom was appropriate."

*Cruz v. Banks*, No. 22-CV-09220, 2024 WL 1309419, at *8 (S.D.N.Y. Mar. 27, 2024).

Finding no denial of a FAPE, the district court declined to reach the remaining prongs of the *Burlington*/*Carter* test.

The district court entered judgment on March 27, 2024, and Cruz timely appealed.

**DISCUSSION**

On appeal, Cruz contends that O.F. was denied a FAPE, iBrain was an appropriate unilateral placement, and the equities favor full reimbursement. Because the question of whether O.F. was offered a FAPE turns on an issue of state regulation for which no controlling decision of the authoritative state court exists, we certify a question to the New York Court of Appeals.

**I.** **Standard of Review**

"We review de novo the district court's grant of summary judgment in an IDEA case." *M.O.*, 793 F.3d at 243 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). At the same time, we remain "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. . . . Deference [to the

agency] is particularly appropriate when the state officer's review has been thorough and careful." *Id.* (internal citations and quotation marks omitted). In general, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). "Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H.*, 685 F.3d at 246.

## II.    Whether the DOE Offered O.F. a FAPE

Cruz advances five arguments to support her claim that the DOE failed to offer O.F. a FAPE. We reject the first four and certify a question to the New York Court of Appeals regarding the fifth.

### a. Cruz's First Four Arguments

Cruz's first four arguments as to why the DOE failed to provide O.F. with a FAPE are unavailing.

First, Cruz argues that the D75 Horan School could not have implemented O.F.'s IEPs because it did not offer an extended school day, which Cruz contends was needed to accommodate O.F.'s services and educational programming. But as the SRO determined, the D75 Horan School would have been able to implement O.F.'s IEPs without an extended school day because many of his related services could have occurred simultaneously with his schooling. Though the IHO had initially determined otherwise, we conclude the SRO's thorough and well-reasoned discussion merits deference.

Next, Cruz argues the IEPs denied O.F. a FAPE because they did not include music therapy. The IDEA "guarantees . . . an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (internal quotation marks omitted). Here, we agree with the SRO that the goals of music therapy were

sufficiently accomplished through other services recommended in the IEPs, and Cruz offers no evidence that music therapy was necessary for a FAPE.

Cruz also argues that the DOE was required to conduct an evaluation before switching O.F.'s class size between the 2020 and 2021 IEPs. But the DOE relied on extensive documentation in formulating the new classroom placement, no state or federal law required new evaluations, and Cruz never requested additional evaluation during the June 2021 IEP process. We agree with the SRO that no additional evaluation was necessary.

Cruz's argument that the IEPs needed to include a ventilator and oxygen for O.F.'s transport is similarly unpersuasive. The SRO found "no evidence in the hearing record" that O.F. required a ventilator and "insufficient evidence" that he needed oxygen during transport. *Cruz*, 2024 WL 1309419 at *10. The SRO concluded that the special transit plans provided by the IEPs, including a 1:1 travel nurse, air conditioning, and a lift bus, were sufficient to provide O.F. with a FAPE. We decline to disturb these findings.

### b. Class Size and Certification

Cruz's final argument is that the June 2021 IEP placed O.F. in a twelve-student classroom in violation of § 200.6(h)(4)(ii)(a), a New York regulation which

requires that class sizes for students with "management needs . . . determined to be highly intensive . . . not exceed six students." We find that this question of state regulation warrants certification to the New York Court of Appeals.

Like many other states, New York has developed a set of education standards that build on the IDEA's baseline requirements. New York Codes, Rules, and Regulations Title 8, § 200.6(h)(4) details different class size requirements for students with disabilities. Two are relevant to our case. The first, § 200.6(h)(4)(ii)(a), states that the class size for "students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention, shall not exceed six students." N.Y. COMP. CODES R. & REGS. tit. 8 § 200.6(h)(4)(ii)(a). The second, § 200.6(h)(4)(iii), states that the class size for "students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment, shall not exceed 12 students." *Id.* at § 200.6(h)(4)(iii).

The parties agree that the SRO applied both regulations to O.F., as he has both severe multiple disabilities and highly intensive management needs. But they disagree as to how the regulations ought to be read in conjunction with one another. Cruz argues that if both regulations apply, the only classroom placement

that would satisfy both is a class of six or fewer students, and a 12:1:4 classroom placement violates § 200.6(h)(4)(ii)(a).[4] The DOE argues that it has the flexibility to pick between the two maximum class sizes when both regulations apply, relying heavily on a nonprecedential Second Circuit summary order. In *Navarro Carrillo v. New York City Department of Education*, the student was similarly subject to both §§ 200.6(h)(4)(iii) and 200.6(h)(4)(ii)(a). No. 21-2639, 2023 WL 3162127, at *3 (2d Cir. May 1, 2023) (summary order). The court held that the two regulations were meant to present a "continuum of classroom options," and so students with both highly intensive management needs and severe multiple disabilities could be placed in either a twelve-student or six-student classroom. *Id.* It concluded that the 12:1:4 class was "the most supportive" for the student, because it had the highest ratio of adults to students, and deferred to the SRO in finding the placement appropriate. *Id.*

Under our "circumscribed" standard of review, we defer to the SRO on issues of educational policy. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). If the question at issue were simply whether O.F. would be

---

[4] Cruz argues that a 6:1:1 placement for O.F. would comply with the requirement in § 200.6(h)(4)(iii) that, "[i]n addition to the teacher, the staff/student ratio shall be one staff person to three students," because O.F. has his own assigned paraprofessional, making the 6:1:1 class a 6:1:2 class.

better supported in a twelve-student classroom with more aides or in a six-student classroom with fewer classmates, deference to the SRO's expertise would be wholly justified.   But the question here is different: does § 200.6(h)(4)(ii)(a) forbid O.F.'s placement in a classroom of more than six students?  Or does the fact that § 200.6(h)(4)(iii) also applies mean that the DOE may exercise discretion and pick between the two class size maximums, as the district court determined here?

As far as we can tell, New York state courts have not provided guidance on how to interpret these two regulations in tandem, or on § 200.6(h)(4) ("Special class size for students with disabilities") at all.  In the interest of "securing prompt and authoritative resolution of unsettled questions of state law," and for the reasons stated below, we invite the New York Court of Appeals to provide their interpretation of these regulations. *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 224 (2d Cir. 2021) (internal quotation marks omitted).

New York law and Second Circuit Local Rule 27.2(a) allow us to certify to New York's highest court "determinative questions of New York law [that] are involved in a case pending before [us] for which no controlling precedent of the

Court of Appeals exists."[5]  *In re Peaslee*, 547 F.3d 177, 183 (2d Cir. 2008) (quoting N.Y. COMP. CODES R. & REGS. tit. 22, § 500.27(a)).  Certification is "an important and highly desirable way for federal courts to give deference to state courts in establishing what state law is."  *Gutierrez v. Smith*, 702 F.3d 103, 116 (2d Cir. 2012). Certification can be especially appropriate for issues "that seem likely to recur and to have significance beyond the interests of the parties in a particular lawsuit."[6] *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 505 (2d Cir. 2004) (quoting *Kidney v. Kolmar Labs., Inc.*, 808 F.2d 955, 957 (2d Cir. 1987)).

In deciding whether to certify, we consider "(1) whether there are authoritative state court interpretations of the [relevant law]; (2) whether the issue is important to a state policy; and (3) whether certification can resolve the appeal." *Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*, 96 F.4th 539, 544 (2d Cir. 2024)

---

[5] "Although the parties did not request certification, we are empowered to seek certification nostra sponte." *CIT Bank N.A. v. Schiffman*, 948 F.3d 529, 537 (2d Cir. 2020) (internal quotation marks omitted). And in any case, both parties have stated they would not be opposed to certification.

[6] While most certified questions involve state common law or statutes, the same rationales apply to questions of state regulation. And our court has certified questions of New York regulations before. *E.g.*, *Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 422 (2d Cir. 2024), *certified question accepted*, 42 N.Y.3d 1044 (2024).

(quoting *Nitkewicz v. Lincoln Life & Ann. Co.*, 49 F.4th 721, 729 (2d Cir. 2022)). All three factors favor certification in this case.

First, the New York Court of Appeals has never interpreted the specific regulations at issue, and no other New York courts have either. This is to be expected; these regulations appear almost exclusively in cases under the IDEA and therefore almost exclusively in federal court. Certification is thus especially appropriate here because without it, "New York courts may be 'substantially deprived of the opportunity to define state law.'" *Ramos v. SimplexGrinnell LP*, 740 F.3d 852, 858 (2d Cir. 2014) (quoting *Gutierrez*, 702 F.3d at 116).

It is true that the SRO has interpreted §§ 200.6(h)(4)(ii)(a) and 200.6(h)(4)(iii) to permit compliance with either provision when both apply. And New York state courts have a longstanding practice of deferring to reasonable agency interpretations of their own regulations. *E.g.*, *Andryeyeva v. N.Y. Health Care, Inc.*, 124 N.E.3d 162, 172 (2019); *Davis v. Mills*, 778 N.E.2d 540, 543 (2002); *Gaines v. N.Y. State Div. of Hous. & Cmty. Renewal*, 686 N.E.2d 1343, 1344 (1997). In some circumstances, this practice of deference might obviate the need for certification

because it would allow us to predict how the Court of Appeals would likely decide the issue.

Not so here. As the New York Court of Appeals has said, "courts are not required to embrace a regulatory construction that conflicts with the plain meaning of the promulgated language." *Andryeyeva*, 124 N.E.3d at 172 (internal quotation marks omitted). There is a clear dissonance between the text of § 200.6(h)(4)(ii)(a), which states that a student's class size "shall not exceed six students," and the agency decisions that have recommended larger class sizes under that very regulation — simply because another regulation also applied. *See, e.g., Perez v. Porter*, No. 21-CV-10415, 2025 WL 26071, at *3 (S.D.N.Y. Jan. 3, 2025); *Melendez v. Banks*, No. 21-CV-1243, 2023 WL 6283108, at *6 (E.D.N.Y. Sept. 26, 2023); *Carrillo v. Carranza*, No. 20-CV-4639, 2021 WL 4137663, at *15–18 (S.D.N.Y. Sept. 10, 2021). Accordingly, whether this is a circumstance that warrants deference to the agency's interpretation is itself a question more suited to resolution by the state court.[7] In the absence of a clear mandate to defer, and in

---

[7] In certifying this question, we also invite the Court of Appeals to address, if it so desires, how, if at all, recent changes in federal administrative law impact its own practice of agency deference. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

the absence of any authoritative state cases, we find ourselves ill-equipped to resolve this question of state education law.

Next, the issue of class sizes for students with both highly intensive management needs and severe multiple disabilities implicates important state policy considerations regarding the education of New York students. It involves a delicate balance of finite state resources and students' educational needs. And any guidance from the New York Court of Appeals would "have significance beyond the interests of the parties in a particular lawsuit," as this question is a recurring one in federal court. *State Farm*, 372 F.3d at 505. In just the last few years, multiple district courts in our Circuit have grappled with reading §§ 200.6(h)(4)(ii)(a) and 200.6(h)(4)(iii) in tandem. *E.g., Perez*, 2025 WL 26071, at *3; *Mason v. Carranza*, No. 20-CV-4010, 2024 WL 3624058, at *5 (E.D.N.Y. Aug. 1, 2024); *Melendez* 2023 WL 6283108, at *6; *Carrillo*, 2021 WL 4137663, at *16. The recurrence of this question makes it even more critical for us to obtain an authoritative answer about the meaning of the New York regulations.

Finally, the state law issue is dispositive in this case. Since Cruz's other contentions are unavailing, whether O.F.'s placement in a twelve-student classroom violates state regulations would singularly determine whether he was

offered a FAPE. *See Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 214 (2d Cir. 2012) ("[T]he IDEA incorporates state substantive standards as the governing federal rule if they are consistent with the federal scheme and meet the minimum requirements set forth by the IDEA." (internal quotation marks omitted)).

Certification, which inevitably delays proceedings, may be unsuitable in certain cases requiring prompt resolution. However, in this case, O.F. has already finished the years of schooling at iBrain for which Cruz seeks reimbursement; there is, therefore, no threat that he will be educationally deprived as the result of this delay.

The dissent makes a broad attack on certification in its introduction and in Section III, as is its right. But it is worth noting these arguments have no basis in the law of the Supreme Court, the law of this Circuit, or as far as we can tell, the law of any circuit. Indeed, the dissent cites not a single case from the Second Circuit for our well-established doctrine governing certification.

Instead, the dissent relies on three Supreme Court cases, one thirty-eight years old, one seventy-six years old, and one two-hundred-and-four years old, for the proposition that certification should be the "exception and not the rule" and that to certify otherwise eschews our obligation to exercise our jurisdiction. *Infra*,

at 15 (quoting *City of Houston v. Hill*, 482 U.S. 451, 467 (1987); *Propper v. Clark*, 337 U.S. 472, 490, 492 (1949)); *infra*, at 19 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

One of these cases, *Propper*, predates the general establishment of certification by two decades, another, *Cohens*, by more than a century and a half.[8] Understandably, the Supreme Court itself cites neither in any of its recent decisions on certification. *See, e.g.*, *McKesson v. Doe*, 592 U.S. 1 (2020); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43 (1997); *Lehman Bros. v. Schein*, 416 U.S. 386 (1974). The most recent case cited by the dissent, *Hill*, is quoted exclusively for its discussion of abstention.

The Supreme Court has previously admonished courts who improperly "blend[ed] abstention with certification." *Arizonans*, 520 U.S. at 79. Yet here, in addition to *Hill*, the dissent quotes three other abstention cases to construct mandates on certification that the Supreme Court has never made: *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), *Allegheny County. v. Frank Mashuda*

---

[8] After the Supreme Court blessed the use of certification in *Lehman Bros. v. Schein*, 416 U.S. 386 (1974), states began to adopt certification procedures in earnest. Kenneth F. Ripple, *Certification Comes Of Age: Reflections on the Past, Present and Future of Cooperative Judicial Federalism*, 95 NOTRE DAME L. REV. 1927, 1930 (2020). In 1976, only fifteen states had certification processes. *Id.* By 1995, forty-three states did, and now, every state except North Carolina allows certification, as does the District of Columbia and Puerto Rico. *Id.*

*Co.*, 360 U.S. 185 (1959), and *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996). *Infra*, at 1, 14, 15.

To the extent clarification is needed, we write to explain that certification and abstention are distinctly different responses to ambiguity in state law: certification entails a federal court deciding a case before it, and abstention does not. Indeed, the problems with abstention were a significant reason certification was established in the first place. *See Arizonans*, 520 U.S. at 76 (contrasting abstention, which "proved protracted and expensive in practice," with certification, which "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response"). Significantly, certification allows us to retain the very jurisdiction that the dissent correctly says is important and ultimately to decide the case ourselves. We decide

the case if the state declines the certified question. We also decide the case, using the state's response as guidance, if the state accepts the certified question.[9]

Once the dissent gets over these misguided attacks, it suggests that we ought not to have certified in this specific case.[10] *Infra*, at 16–18. These arguments are the kind that courts always weigh in deciding whether certification is desirable in a particular case. Suffice it to say the majority of this panel did not find these arguments convincing in this case, which is why we certify.[11]

## CONCLUSION

For the reasons discussed above, we certify the following question:

> When a student is covered by more than one class size regulation under § 200.6(h)(4), do the varying restrictions serve as

---

[9] Sometimes the state's answer enables a clear holding, *see, e.g.*, *In re Peaslee*, 585 F.3d 53, 57 (2d Cir. 2009), at other times its answer causes us to remand to the district court for additional fact finding, *see, e.g.*, *Carroll v. Trump*, 66 F.4th 91, 94 (2d Cir. 2023). Either way we exercise our jurisdiction.

[10] In doing so, the dissent attempts to distinguish between certification under diversity jurisdiction and under nondiversity jurisdiction, arguing that certification is only appropriate in the former and not appropriate in cases that raise "nonconstitutional federal issue[s]." *Infra*, at 15. This is wrong. Like many circuits, the Second Circuit has regularly certified questions in cases that "raise a nonconstitutional federal issue." *See, e.g.*, *Carroll v. Trump*, 49 F.4th 759, 780 (2d Cir. 2022), *certified question answered*, 292 A.3d 220 (D.C. 2023) (certifying state law question that impacts Defendant's immunity defense under Westfall Act); *Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 422 (2d Cir.), *certified question accepted*, 42 N.Y.3d 1044, 249 N.E.3d 37 (2024) (certifying state law question that impacts Plaintiff's RICO claim). Indeed, one study from 2019 found that 25% of cases certified across the country were nondiversity cases. Ripple, *supra, at* 1946. In any event, this distinction has no logical basis. When a statute makes state law central in a federal question case, it is Congress itself that has asked us to follow state law. It is therefore especially important that we get that law right.

[11] Because we are certifying a question relevant to the first prong of the *Burlington/Carter* test, we need not reach the remaining two prongs.

distinct requirements that must be independently fulfilled or as a list of class size options from which the DOE may pick?

Should the New York Court of Appeals choose to grant certification, it is invited to address any other related questions it finds germane. This panel retains jurisdiction to consider all issues that remain before us once the Court of Appeals has either provided us with its guidance or has declined certification.

It is hereby **ORDERED** that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this court.

## CERTIFICATE

The foregoing is hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule 27.2 and New York Codes, Rules, and Regulations Title 22, § 500.27(a), as ordered by the United States Court of Appeals for the Second Circuit.

PARK, *Circuit Judge*, dissenting:

This federal question case under the Individuals with Disabilities Education Act ("IDEA") requires deciding whether New York's education regulations permit a disabled child to be placed in a class with twelve students. A New York State Independent Hearing Officer ("IHO"), a State Review Officer ("SRO"), and the district court all said yes, and under New York law, we "must defer" to that "rational interpretation." *Peckham v. Calogero*, 12 N.Y.3d 424, 431 (2009). But instead of doing so, the majority certifies to the New York Court of Appeals, seeking the views of a fifth decision-maker and further delaying this four-year-old litigation.

Certification here is not just unnecessary and inefficient; it shirks our "virtually unflagging . . . obligation to hear and decide a case" within our jurisdiction. *Sprint Comm'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quotation marks omitted). Indeed, when "a nonconstitutional federal [question] . . . depends upon . . . an underlying issue of state law," we should not delay until state courts "have settled the issue of state law." *Propper v. Clark*, 337 U.S. 472, 490, 492 (1949). It is our job to decide this case without waiting for another court's views, so I respectfully dissent from the majority's decision to punt.

# I

## A

The IDEA "represents an ambitious federal effort to promote the education of handicapped children." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982). Historically, "state statutes or local rules and

policies" had excluded "many disabled children" from schooling. *Honig v. Doe*, 484 U.S. 305, 309 (1988).  So Congress stepped in "to ensure that all children with disabilities" receive "a free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).

Although the IDEA "was intended to reverse [states'] history of neglect," its design "is frequently described as a model of cooperative federalism."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (quotation marks omitted).  Congress "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance" with three "significant requirements."  *Rowley*, 458 U.S. at 179, 183.  First, a state must implement "policies and procedures to ensure that the State meets" minimum educational requirements.  20 U.S.C. § 1412(a).  Second, a state must provide disabled students with an Individualized Education Program ("IEP"), *id.* § 1414(d), that "meet[s] the standards of the State educational agency," *id.* § 1401(9)(B), and enables "progress appropriate in light of the child's circumstances," *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 399 (2017).  Finally, a state must provide parents with "[a]dministrative procedures" for challenging an IEP, including a hearing, an appeal, and the "[r]ight to bring [a] civil action" in federal or state court.  20 U.S.C. § 1415(i).

To comply with these requirements, New York overhauled its education laws the year after the IDEA was enacted.  *See* Act of July 26, 1976, ch. 853, Laws of N.Y., art. 89.  This resulted in two changes relevant here.

2

First, New York "assigned responsibility for developing appropriate IEPs to local Committees on Special Education," *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998), and created an appeals process for parents to challenge their child's IEP, *see* N.Y. Educ. Law ("NYEL") § 4404. Under that process, a parent "must state all of the alleged deficiencies in the IEP in [an] initial due process complaint" submitted to an IHO. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 188 n.4 (2d Cir. 2012). After the IHO rules on the sufficiency of the IEP, the parent may appeal to an SRO. *See* N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8 § 200.5(k). Finally, the decisions of the IHO and SRO can be contested in federal or state court. But "[c]ourts generally defer to the final decision of the state authorities." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (quotation marks omitted).

Second, New York required the State Commissioner of Education to develop "rules and regulations pertaining to the physical and educational needs of [disabled] children," including "prescribing the maximum class size in . . . special education classes." NYEL § 4403(3). Under the Commissioner's current class-size regulation, *see* 8 NYCRR § 200.6(h)(4), five subsections prescribe different maximum class sizes depending on the particular needs of a student's disability. Subsections (ii)(a) and (iii) are important here.

Subsection (ii)(a) provides:

> The maximum class size for special classes containing students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention, shall not

3

exceed six students, with one or more supplementary school personnel assigned to each class during periods of instruction.

And subsection (iii) provides:

The maximum class size for those students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment, shall not exceed 12 students. In addition to the teacher, the staff/student ratio shall be one staff person to three students. The additional staff may be teachers, supplementary school personnel and/or related service providers.

8 NYCRR § 200.6(h)(4)(ii)(a), (iii).

**B**

Plaintiff-Appellant Neysha Cruz is the mother of O.F., a non-verbal, non-ambulatory student with cerebral palsy and a seizure disorder. She claims that O.F.'s 2021 IEP violated the IDEA because it failed to "meet the standards of [New York's] educational agency." 20 U.S.C. § 1401(9)(B).

In particular, Cruz's due process complaint objected to O.F.'s placement in a class with twelve students, one teacher, and four staff members ("12:1:4"). Under subsection (iii) of New York's class-size regulation, a 12:1:4 placement is appropriate for "students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment." 8 NYCRR § 200.6(h)(4)(iii). But Cruz argued that O.F. has highly intensive needs and thus should have been placed in a class with six students, one teacher, and one staff

4

member ("6:1:1"). Cruz pointed to subsection (ii)(a) of New York's class-size regulation, which provides that students with "highly intensive . . . management needs . . . requiring a high degree of individualized attention" cannot be placed in a class with more than six students. *Id.* § 200.6(h)(4)(ii)(a).

The IHO rejected Cruz's argument, finding that O.F.'s placement was more appropriately governed by subsection (iii) than subsection (ii)(a). First, the IHO explained that O.F.'s "rate of [academic] progress was often dictated by his physical health and his overall well-being." Dist. Ct. Dkt. 13, Ex. 14, at 14. So it was better to group O.F. with other students "whose programs consist primarily of habilitation and treatment," 8 NYCRR § 200.6(h)(4)(iii), than with those "requiring a high degree of individualized attention," *id.* § 200.6(h)(4)(ii)(a). Second, the IHO noted that the extra staff members in a larger, 12:1:4 class would facilitate "monitor[ing]" of O.F.'s "therapeutic, health, toileting, and ambulation needs." Dist. Ct. Dkt. 13, Ex. 14, at 18. In turn, this extra attention would benefit O.F. academically.

Cruz appealed to an SRO, again arguing that subsection (ii)(a) precluded O.F. from being placed in a class with more than six students. Although the SRO acknowledged that O.F. "exhibit[s] highly intensive management needs and require[s] a high or significant degree of individualized attention," it still found a 12:1:4 class appropriate. Dist. Ct. Dkt. 13, Ex. 4, at 8. Like the IHO, the SRO read New York's class-size regulation to require placement based on the *single* subsection that best matches the needs of a student's disability. So even though "either" subsection (ii)(a) or (iii) "could"

5

have applied to O.F., the SRO sought to determine which of those two provisions was better. *Id.* at 7.

The SRO determined that subsection (iii) suited O.F.'s disability better than subsection (ii)(a). Dist. Ct. Dkt. 13, Ex. 4, at 8. It explained that O.F.'s "highly intensive needs are due to his severe multiple disabilities," so a placement based on subsection (ii)(a) would have been "reductive." *Id.* It was in O.F.'s best interests to be placed in a 12:1:4 class focused on "habilitation and treatment," with more staff members to "monitor . . . therapeutic, health, toileting, and ambulation needs," Dist. Ct. Dkt. 13, Ex. 14, at 18.

Cruz then filed a complaint in the Southern District of New York. The district court granted summary judgment to Defendants, deferring to the state administrators' conclusion that "placement in a 12:1:4 classroom was appropriate." *Cruz v. Banks*, 2024 WL 1309419, at *8 (S.D.N.Y. Mar. 27, 2024).

## II

On appeal, Cruz continues to argue that O.F.'s IEP violated the IDEA by failing to "meet the standards of [New York's] educational agency." 20 U.S.C. § 1401(9)(B). She says that the SRO found O.F. to "exhibit highly intensive management needs and require a high or significant degree of individualized attention," Dist. Ct. Dkt. 13, Ex. 4, at 8, so subsection (ii)(a) of New York's class-size regulation required O.F. to be placed in a six-student class.

Cruz's argument requires us to apply New York law to construe New York's class-size regulation. We thus look to the interpretive rules that New York's courts would use. *Cf. Morenz v.*

6

*Wilson-Coker*, 415 F.3d 230, 236-37 (2d Cir. 2005) ("[W]e are bound to interpret Connecticut law according to Connecticut's own interpretive rules.").

## A

Under New York law, courts "must defer" to an agency's "rational interpretation of its own regulations." *Peckham*, 12 N.Y.3d at 431. That includes the rational decisions of adjudicative bodies like the IHO and SRO. *See id.* at 428.

This rule is highly deferential—an agency's interpretation can be "rational" without actually being "correct." *See Elcor Health Servs., Inc. v. Novello*, 100 N.Y.2d 273, 280 (2003) ("That the [agency's] interpretation might not be the most natural reading of the regulation . . . does not make the interpretation irrational."). For example, in *Kaufman v. Sarafan*, 59 N.Y.2d 855 (1983), a New York State Racing and Wagering Board regulation provided that "[a]ll objections except claims of interference during a [horse] race must be in writing," 9 NYCRR § 4039.11. The Board interpreted this to allow a track steward to object *orally* to a horse's weight, but the New York Court of Appeals still deferred. It explained that "the purpose of the rule" was to "discourag[e] disgruntled owners, trainers and jockeys from making vague and frivolous objections, [so] it cannot be said that the [B]oard's determination . . . was arbitrary and capricious." *Kaufman*, 59 N.Y.2d at 857. There was "a rational basis for the decision." *Entergy Nuclear Operations, Inc. v. N.Y. State Dep't of State*, 28 N.Y.3d 279, 284 (2016) (quotation marks omitted).

To be sure, the majority is correct that "courts are not required to embrace a regulatory construction that conflicts with the plain

7

meaning of the promulgated language." *Ante* at 17 (quoting *Andryeyeva v. N.Y. Health Care, Inc.*, 33 N.Y.3d 152, 172 (2019)). But that high standard is met when an agency's interpretation is "inconsistent with . . . the *only* meaning that may be ascribed to [a regulation's] language." *Andryeyeva*, 33 N.Y.3d at 176-77 (emphasis added). Otherwise, an agency's "interpretation of [a] regulation will be controlling and will not be disturbed in the absence of weighty reasons." *Sigety v. Ingraham*, 29 N.Y.2d 110, 114 (1971).

New York's rule thus gives substantially greater deference to state agencies than courts used to give to *federal* agencies. Under the analogous federal rule, deference applied only when a regulation was "genuinely ambiguous." *Kisor v. Wilkie*, 588 U.S. 558, 563 (2019). But under New York law, "ambiguity" is irrelevant. A "rational" interpretation does not have to be "correct," which means that *all* of an agency's regulations receive interpretive deference. *See, e.g.*, *Andryeyeva*, 33 N.Y.3d at 175 (rejecting the argument "that an agency's interpretation is entitled to no deference where the question is one of pure legal interpretation of statutory terms" (quotation marks omitted)).

**B**

Cruz argues that the IHO and SRO misinterpreted New York's class-size regulation by placing O.F. in a 12:1:4 class despite finding that he "exhibit[s] highly intensive management needs and require[s] a high or significant degree of individualized attention." Dist. Ct. Dkt. 13, Ex. 4, at 8. The majority likewise sees "a clear dissonance" between O.F.'s placement and the six-student maximum under subsection (ii)(a). *Ante* at 17.

8

Cruz and the majority disagree with the IHO and SRO because they see subsections (ii)(a) and (iii) as *overlapping* requirements. In their view, "*both* regulations apply" to O.F., who has "highly intensive management needs" under subsection (ii)(a) *and* "severe multiple disabilities" under subsection (iii). *Ante* at 3 (emphasis added). So O.F.'s placement must comply with both subsections, including subsection (ii)(a)'s six-student limit.

The IHO and SRO interpret New York's class-size regulation differently. Under their interpretation, subsections (ii)(a) and (iii) are mutually exclusive choices in a menu of class-size options. So even though "either" subsections (ii)(a) or (iii) "could" have applied to O.F., his class placement was governed by the single subsection that best matched his needs. Dist. Ct. Dkt. 13, Ex. 4, at 7. That was subsection (iii), because O.F.'s "highly intensive needs are due to his severe multiple disabilities." *Id.* at 8.

Under New York law, we "must defer" to the IHO's and SRO's interpretation for two reasons. *Peckham*, 12 N.Y.3d at 431. First, there was "a rational basis for the decision." *Entergy*, 28 N.Y.3d at 284 (quotation marks omitted). As the SRO explained, it would have been "reductive" to read subsection (ii)(a) to require every student with "highly intensive management needs" to be placed in a six-student class. Dist. Ct. Dkt. 13, Ex. 4, at 8. Some students with highly intensive management needs are better off in a 12:1:4 class with more staff members and a greater focus on habilitation and treatment. *See Navarro Carrillo v. N.Y.C. Dep't of Educ.*, 2023 WL 3162127, at *3 (2d Cir. May 1, 2023) ("[T]he 12:1:4 is the most supportive classroom available."). So it is hardly "irrational" to construe New York's class-

9

size regulation as giving administrators flexibility to place students in the most appropriate class.

Like the Racing and Wagering Board interpretation in *Kaufman*, the IHO's and SRO's interpretation is consistent with "the purpose of the rule." 59 N.Y.2d at 857. The purpose of New York's class-size requirements is "to meet [each] student's unique needs," 8 NYCRR § 200.6(a)(2), and the agency determined that a 12:1:4 class best met O.F.'s needs. "[I]t cannot be said that the [agency's] determination . . . was arbitrary and capricious." *Kaufman*, 59 N.Y.2d at 857.

Second, the IHO's and SRO's interpretation did not conflict with "the *only* meaning that may be ascribed to [the regulation's] language." *Andryeyeva*, 33 N.Y.3d at 177 (emphasis added). In fact, three cues support the IHO's and SRO's view of subsections (ii)(a) and (iii). First, unlike provisions in New York's education regulations in which multiple requirements apply at once, the word "and" does not connect the different subsections of the class-size regulation.[1] Second, other regulations refer to subsections (ii)(a) and (iii) as different types of "special classes"—not overlapping requirements that govern the

---

[1] *See* 8 NYCRR § 200.6(f)(4) (listing factors for determining "the similarity of the individual needs of the students"); *id.* § 200.6(h)(2) (same); *id.* § 200.6(j)(1)(iii) (listing documentation needed to show "that appropriate public facilities for instruction are not available"); *id.* § 200.6(j)(2) (listing exceptions to when a placement "shall be approved for purposes of State reimbursement"); *id.* § 200.6(j)(5)(i) (listing necessary kinds of "corrective action"); *id.* § 200.6(n) (listing requirements for students placed in an "interim alternative education setting").

arrangement for the *same* class.[2]  Finally, the section heading of New York's class-size regulation indicates that it is part of a "[c]ontinuum of services," 8 NYCRR § 200.6, and a "continuum" is "a collection, sequence, or progression of values" that do not overlap, *Merriam-Webster's Collegiate Dictionary* 270 (11th ed. 2020).

In light of these cues, the IHO's and SRO's interpretation is at least as "rational" as the decision of the Department of Health in *Elcor Health*, 100 N.Y.2d at 278.  There, a Department reimbursement regulation required documentation to "support that patient has this potential/is improving," 10 NYCRR § 86-2.30(i)(27), and the Department interpreted the slash in its regulation to mean "and" instead of "or."  The New York Court of Appeals thought this was not "the most natural reading" but it still deferred, because the Department's choice of "and" instead of "or" did not go so far as to "conflict with the plain language of the regulation."  *Elcor Health*, 100 N.Y.2d at 280.

Here, the interpretive question is the mirror image of *Elcor Health*.  Instead of arguing that a regulation meant "or" instead of "and," Cruz argues that New York's class-size regulation requires O.F.'s class placement to be based on subsections (ii)(a) "*and*" (iii), instead of subsections (ii)(a) "*or*" (iii).  But an agency's choice between "and" and "or"—even if not "the most natural reading"—is not the sort of "weighty reason[]" that would "make [an] interpretation irrational."  *Elcor Health*, 100 N.Y.2d at 280 (quotation marks omitted).

---

[2] *See* 8 NYCRR § 200.6(h)(7) (referring to "special classes described in subparagraphs (4)(ii) and (iii) of this subdivision"); *id.* § 200.6(h)(8) (same).

11

Thus, "even if [we] would have reached a different result," *Terrace Ct., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*, 18 N.Y.3d 446, 454 (2012), we "must defer" to the IHO and SRO, *Peckham*, 12 N.Y.3d at 431.

In short, we are bound to interpret New York law according to New York's own interpretive rules. And those rules require deference to the IHO's and SRO's construction of New York's class-size regulation. So we should reject Cruz's argument that O.F.'s IEP violated the IDEA by not "meet[ing] the standards of [New York's] educational agency." 20 U.S.C. § 1401(9)(B).

## III

Certification here is improper because we are interpreting "the standards of [New York's] educational agency" to decide Cruz's *federal* cause of action under the IDEA. 20 U.S.C. § 1401(9)(B). "Where a case involves a nonconstitutional federal issue," our decision should not "be delayed until the courts of New York have settled the issue of state law." *Propper*, 337 U.S. at 490, 492.

## A

"Normally, federal jurisdiction is not optional." *BP P.L.C. v. Mayor & City Council*, 141 S. Ct. 1532, 1537 (2021). It is an "undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989); *see* U.S. Const. art. I, § 8, cl. 9; *id.* art. III, § 1. So "it is the duty of a federal court to decide [a] question when presented to it." *Zwickler v. Koota*, 389 U.S. 241, 251 (1967) (quotation marks omitted).

The Supreme Court frequently invokes this principle to limit abstention. In that context, the Court has warned that "[w]e would defeat [Congress's] purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court." *McNeese v. Bd. of Educ.*, 373 U.S. 668, 672 (1963).[3]

Certification poses similar separation-of-powers concerns. It requires the parties to relitigate an issue already before us, which "entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 394 (1974) (Rehnquist, J., concurring). That delay "may be considered a violation of the separation of powers if it has not been contemplated by Congress." Martin H. Redish, *The Federal Courts in the Political Order: Judicial Jurisdiction and American Political Theory* 60 (1991).[4]

---

[3] The majority claims that abstention is "distinctly different" from certification because it does not "entail[] a federal court deciding a case before it." *Ante* at 21. Not so. An abstaining court "retain[s] jurisdiction, since a party has the right to return . . . after obtaining the authoritative state court construction for which the court abstained, for a final determination of his claim." *NAACP v. Button*, 371 U.S. 415, 427 (1963); *see also England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 416 (1964) ("[A]bstention does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise." (quotation marks omitted)).

[4] To be sure, certification is less "protracted and expensive" than abstention, so courts should not "blend[]" the two doctrines. *Ante* at 20-21 (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 76, 79 (1997)). But

13

For this reason, the Supreme Court has said that federal courts should "rarely resort[] to state certification procedures." *McKesson v. Doe*, 592 U.S. 1, 5 (2020); *cf. Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 395 (1988) (certifying due to "unusual circumstances"). Indeed, the Court's cases identify only two "exceptional instances" where certification is warranted. *McKesson*, 592 U.S. at 5.

First, federal courts may certify when a state-law issue could avert the need to confront a constitutional question. *See, e.g.*, *United States v. Juv. Male*, 560 U.S. 558, 561 (2010). This furthers the "cardinal principle" requiring courts to "ascertain whether a construction is fairly possible that will contain [a] statute within constitutional bounds." *Arizonans*, 520 U.S. at 78 (cleaned up).

Second, federal courts sitting in diversity may certify "when the exercise of jurisdiction . . . would disrupt . . . federal-state relations." *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 189-90 (1959); *see, e.g.*, *Lehman Bros.*, 416 U.S. at 391. The point is to prevent "a serious affront to the interests of federalism." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 733 (1996) (Kennedy, J., concurring). So we may ask a

---

certification and abstention differ in degree, not in kind. *See Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 56 (2017) (Sotomayor, J., concurring) ("[A]bstention and certification serve the same goals."); *Stenberg v. Carhart*, 530 U.S. 914, 945 (2000) (discussing when "[c]ertification of a question (or abstention) is appropriate"). Both doctrines are "a deferral device," *Arizonans*, 520 U.S. at 75, so they both cut against "the duty of a federal court to decide [a] question *when presented to it*," *Zwickler*, 389 U.S. at 251 (cleaned up).

14

state's views on "novel, unsettled questions of state law" that implicate important state prerogatives. *Arizonans*, 520 U.S. at 78.

But these two circumstances are "the exception and not the rule." *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (declining to certify).[5] In all other cases—that is, those raising "a nonconstitutional federal issue"—the Supreme Court has explicitly "reject[ed] the suggestion that a decision" can "be delayed until [state] courts . . . have settled [an] issue of state law." *Propper*, 337 U.S. at 490, 492.

Far from a "mandate[] . . . that the Supreme Court has never made," *ante* at 20, this limitation is evidenced by decades of precedent. The Supreme Court first ordered a federal court to certify a question in 1960. *See Clay v. Sun Ins. Off. Ltd.*, 363 U.S. 207, 212 (1960). And in the sixty-five years since, federal law has incorporated state standards in broad areas such as sentencing, immigration, and arbitration. *See, e.g.*, 18 U.S.C. § 924(c)(3) (defining a "crime of violence" in relation to state law); 8 U.S.C. § 1101(a)(43)(F) (same). But the Court has not once certified a question in a nonconstitutional federal question case.[6]

---

[5] The majority accuses the dissent of quoting from *Hill*'s "discussion of abstention." *Ante* at 20. But in *Hill*, the Court said that "[t]he possibility of certification does not change our analysis" as to why delaying a decision is inappropriate. 482 U.S. at 470.

[6] The cases in which the Supreme Court has approved the use of certification have either been diversity actions, *see, e.g.*, *McKesson*, 592 U.S. at 5; *Lehman Bros.*, 416 U.S. at 391; *Clay*, 363 U.S. at 212, or involved a constitutional challenge, *see, e.g.*, *Juv. Male*, 560 U.S. at 561; *Am. Booksellers*,

**B**

This case raises a nonconstitutional federal question. *See* 20 U.S.C. § 1401(9)(B) (providing that an IEP must "meet the standards of the State educational agency"); *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956) ("The scope of a federal right is, of course, a federal question, [even if] its content is . . . to be determined by state, rather than federal law."). It follows "that a decision in this case . . . should [not] be delayed until the courts of New York have settled the issue of state law." *Propper*, 337 U.S. at 492.

The majority tries to defend its decision to certify on two grounds. First, it says we are "ill-equipped to resolve" this case because "New York state courts have not provided guidance on how to interpret" New York's class-size regulation. *Ante* at 14, 18. But understanding state law is part of what federal judges do. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("The very essence of the *Erie* doctrine is that the bases of state law are presumed to be communicable by the parties to a federal judge no less than to a state judge."). "All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens v. Virginia*, 19 U.S. (6

---

484 U.S. at 398; *Elkins v. Moreno*, 435 U.S. 647, 668 (1978). The majority cites a law review article reporting "that 25% of cases certified across the country were nondiversity cases." *Ante* at 22 n.10 (citing Kenneth F. Ripple, *Certification Comes of Age: Reflections on the Past, Present and Future of Cooperative Judicial Federalism*, 95 Notre Dame L. Rev. 1927, 1930 (2020)). But that tally "included actions brought under 42 U.S.C. § 1983" involving constitutional challenges. Ripple, *supra*, at 1946 n.131.

Wheat.) 264, 404 (1821); *see also Stenberg*, 530 U.S. at 945 (refusing to certify despite "lack [of] any authoritative state-court construction").

Second, the majority invokes federalism, explaining that "the issue of class sizes for students with . . . disabilities implicates important state policy considerations." *Ante* at 18. But while this argument may make sense in a diversity case, it cannot justify certification in a federal question case such as this.

The difference is that a federal question case implicates a federal interest that is not part of the equation in a diversity dispute, "where the only issue [is] one of state law." *Propper*, 337 U.S. at 489. Cruz's challenge here is not just about New York's class-size regulation—it is about what is required under the IDEA, an "ambitious federal effort to promote the education of handicapped children." *Rowley*, 458 U.S. at 179. That federal interest tips the scales against certification because "to refrain from deciding . . . a nonconstitutional federal issue" would be to undermine Congress's intention about the speed at which that claim would be resolved. *Propper*, 337 U.S. at 490; *see also Zwickler*, 389 U.S. at 251-52 (explaining that "the role of state courts as the final expositors of state law" should not interfere with "the primacy of the federal judiciary in deciding questions of federal law" (quotation marks omitted)).[7]

---

[7] Even setting aside the federal interest in this IDEA challenge, New York's interest in interpreting its class-size regulation is particularly weak. That regulation exists only because after a "history of neglect," *Schaffer*, 546 U.S. at 52, the IDEA required New York to enact "policies and procedures" providing for the education of students with disabilities, 20 U.S.C. § 1412(a). So it not quite correct to say "the issue is one of local law." Guido Calabresi,

This case is a perfect example. Congress designed a "ponderous" process for challenging an IEP, *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985), intending that "[b]y the time any dispute reache[d] court," a state would "have had a complete opportunity to bring . . . [its] judgment to bear," *Endrew F.*, 580 U.S. at 404. But today, after nearly four years of litigation before state administrators and federal judges, the majority sends the parties *back* to state court, frustrating Congress's design. Whoever wins this appeal in the end, it will "be an empty victory to have a court tell them several years later that they were right." *Burlington*, 471 U.S. at 370.[8]

## IV

The majority's decision to certify should not be mistaken for judicial modesty. For decades, our IDEA opinions have consistently construed New York's education regulations. *See, e.g.*, *Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 103 (2d Cir. 1998). And

---

*Federal and State Courts: Restoring a Workable Balance*, 78 N.Y.U. L. REV. 1293, 1299 (2003). New York's class-size regulation is actually an appendage designed to plug into a scheme of "cooperative federalism." *Schaffer*, 546 U.S. at 52 (quotation marks omitted).

[8] The majority says we need not worry about delay because O.F. has already finished the 2021 school year. *Ante* at 19. This ignores the "important practical question[]" of "financial responsibility" for the $163,000 Cruz spent on that schooling, *Burlington*, 471 U.S. at 361—not to mention the "considerable time and expense" the parties have incurred in litigation, *Allegheny Cnty.*, 360 U.S. at 196. Moreover, if the "policy considerations" at stake here are as important as the majority claims, *ante* at 18, it would do a disservice to deny "that promptness of decision which in all judicial actions is one of the elements of justice," *Forsyth v. City of Hammond*, 166 U.S. 506, 513 (1897).

18

just over a year ago, we interpreted by summary order the very provision at issue here. *See Navarro Carrillo*, 2023 WL 3162127, at *3. But now, the majority reverses course, "usurp[ing]" Congress's power to define our jurisdiction. *Cohens*, 19 U.S. at 404.

"It is emphatically the province *and duty* of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). The majority fails to discharge its duty to interpret New York's class-size regulation—a task we can and should complete now. I respectfully dissent.